CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
JUN 17 2008
JOHN F. CORCORAN, CLERK
BY: DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| ELIZABETH HALL, | ) |
|         Plaintiff | ) |
| v. | ) Civil Action No. 6:07cv21 |
| COMMISSIONER OF SOCIAL SECURITY, | ) By:  Michael F. Urbanski |
|         Defendant | )        United States Magistrate Judge |

## REPORT AND RECOMMENDATION

Plaintiff Elizabeth Hall ("Hall") brings this action for review of the Commissioner of Social Security's ("Commissioner's") decision denying her claim for supplemental security income benefits under the Social Security Act. This case presents two issues on appeal. The first issue is whether the Commissioner's opinion is improperly tainted by references to prescription narcotic abuse. The second is whether the Commissioner erred in evaluating the medical opinions of treating and consulting physicians regarding the functional limitations imposed by Hall's claimed fibromyalgia and back condition. Review of the record and the decision of the Administrative Law Judge ("ALJ") does not reveal the taint suggested by Hall. In fact, in a sixteen page, single-spaced opinion detailing Hall's physical symptoms and treatment, only a few sentences mention prescription medication abuse. Consideration of the opinion as a whole simply does not support Hall's contention that the ALJ's decision was somehow inappropriately slanted as a result of these references. Second, the record also reflects that the ALJ gave careful consideration to the treatment records and opinions from all of Hall's treating sources consistent with social security regulations. As such, it is recommended that this case be affirmed.

# I.

The court may neither undertake a de novo review of the Commissioner's decision nor re-weigh the evidence of record. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to satisfy the Act's entitlement conditions. See Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Perales, 402 U.S. at 401. If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

The Commissioner employs a five-step process to evaluate disability claims. 20 C.F.R. §§ 404.1520, 416.920; see also Heckler v. Campbell, 461 U.S. 458, 460-462 (1983). The Commissioner considers, in order, whether the claimant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his or her past relevant work; and if not, (5) whether he or she can perform other work. Id. If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step. Id. Once the claimant has established a prima facie case for disability, the burden then shifts to the Commissioner to establish that the claimant maintains the residual functioning capacity ("RFC"), considering the

2

claimant's age, education, work experience, and impairments, to perform alternative work that exists in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

## II.

Hall, born in 1963, claims supplemental security income benefits due to fibromyalgia and back problems as of March 31, 2004. Prior to the alleged onset date, Hall worked as a laborer for a wood working company and a timber cutter's helper, and as a laundry attendant in a nursing home. (Administrative Record, hereinafter "R." at 135) Hall stated that she stopped working in 1998 because she "started having problems with high blood pressure, stress, anxiety attacks, chest pain, arm pain, back pain, breathing problems etc." (R. 134) The ALJ found that Hall has the following severe impairments: "a back disorder, high blood pressure with fatigue and dizziness, and substance abuse." (R. 16) The ALJ concluded that "[t]he claimant's alleged fibromyalgia, temperomandibular joint syndrome (TMJ), asthma, residuals from gynecological surgeries, and a mental disorder (an affective disorder with stress and anxiety attacks, including chest pain, arm pain, breathing problems, and 'sick spells') are singly and in combination not established by the objective medical record as 'severe' impairments imposing more than a minimal effect on the claimant's functional capabilities for the twelve month durational requirement of the regulations." (R. 16) The ALJ also concluded that Hall's mental disorder imposed no functional limitations while noting that prescription narcotic medication abuse imposed moderate functional limitations regarding her activities of daily living, social functioning, and concentration, persistence or pace. (R. 16)

3

As explained in a detailed nine page evaluation of Hall's medical records and other evidence, the ALJ concluded that Hall could not return to her past work, but retained the residual functional capacity to perform a range of light exertional work. At the administrative hearing, a vocational expert ("VE") testified that other work existed in significant numbers in the national economy that Hall could perform.

### III.

Hall's first contention, that the ALJ's decision was tainted by the suggestion of prescription narcotic abuse, is not borne out by the decision itself. At great length, the ALJ catalogs Hall's various physical complaints and the treatment she received, and while in fact there are some references to prescription narcotic abuse, these references do not in any sense dominate the analysis, but rather are reflective of and consistent with the medical evidence.[1] In

---

[1] The undersigned has noted the following references to prescription narcotic abuse. On the bottom of page 3 of the decision, the ALJ notes "[t]he claimant's narcotic prescription abuse . . . imposes moderate functional limitations regarding activities of daily living, social functioning, and concentration, persistence or pace." (R. 16) On the middle of the page 4, the ALJ writes "[w]hile the claimant has a severe substance abuse problem with episodic disruption of functioning it is not so severe as to meet section 12.09 of the medical Listing of Impairments." (R. 17) On page 5, the ALJ notes that "[t]he claimant admitted that she has been an alcoholic and used illegal drugs, but that she last used 'pot' ten years previously and now drinks once every three months. . . . She stated that she takes 'heavy' pain medications (Percocet and Oxycodone) and Cymbalta, has tried injections, and has been given back exercises. . . . She indicated that she has a 'tear' in a back disc, and has been taking Percocet for more than one year, but has not been treated with Oxycontin, and her doctor has not accused her of taking more pain medication than she needs." (R. 18, 477, 503) Four pages later, on page 9, the decision notes that "she reported that she lost her Percocet prescription and it was refilled after clarification regarding requirements of a police report and other legal requirements." (R. 22) Three pages later, on page 12, the ALJ notes "[a]s a result of her constant, chronic complaints of pain, every doctor has prescribed pain medication. However, it is apparent throughout the medical record, the claimant suffers from decreased functioning, probably as a result of heavy pain medication usage." On page 13, the ALJ writes "[t]hroughout the medical record as well as claimant's testimony, she has admitted to a history of alcoholism, prior use of 'pot' and other illegal drugs, and occasional current use of alcohol, a situation certainly not advisable with the prescription medications." (R.

4

no respect can these references be considered to taint the detailed analysis undertaken by the ALJ.

## IV.

An ALJ is required to analyze every medical opinion received and determine the weight to give to such an opinion in making a disability determination. 20 C.F.R. § 404.1527 (d). A treating physician's opinion is to be given controlling weight if it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001) ("[A] treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."); 20 C.F.R. § 404.1527 (d)(2); Social Security Ruling 96-2p. The ALJ is to consider a number of factors which include whether the physician has examined the applicant, the existence of an ongoing physician-patient relationship, the diagnostic and clinical support for the opinion, the opinion's consistency with the record, and whether the physician is a specialist. 20 C.F.R. § 404.1527. A treating physician's opinion cannot be rejected absent "persuasive contrary evidence," and the ALJ must provide the reasons for giving a treating physician's opinion certain weight or explain why a physician's opinion was discounted. Mastro, 270 F.3d at 178; 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision

---

26) Later on that same page, the ALJ states "[i]t must be noted that with a history of substance abuse one cannot rule out a secondary gain from the use of narcotic prescriptions." (R. 26) Additionally, there are a couple of references in the decision and the medical records to required drug screening. (R. 24, 26, 468)

5

for the weight we give your treating source's opinion."); SSR 96-2p ("the notice of determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.")

Hall contends that the ALJ improperly rejected the opinions reflected in a "Fibromyalgia Residual Functional Capacity Questionnaire" completed by her treating primary care physician, Dr. Robert Strong. (R. 510-14) Hall also argues that the ALJ erred by not finding her fibromyalgia to be a severe impairment. In contrast to the ALJ's detailed scrutiny of the totality of Hall's treatment history, Hall's argument focuses only on the opinions of two doctors, Strong and Winikur, and ignores the opinions of the other doctors who treated, examined or evaluated Hall.

Social security regulations do not require that the Commissioner accept only those opinions which favor the claimant. Rather, the Commissioner is required to evaluate all of the opinions of acceptable medical sources and provide specific reasons for the weight given to each source. Here, the ALJ did just that. In page after page of detailed analysis, the ALJ scrutinizes the entirety of Hall's medical history and carefully catalogs her complaints and treatment. (R 5-14) The ALJ addresses not only the care provided by Drs. Strong and Winikur on which Hall hinges her argument, but also provides a detailed discussion of Hall's symptoms as recounted by her and the treatment she received from Dr. Christine Barrett, Wolfe Medical Associates, Dr. William W. Pasley, Dr. John R. Merten, Dr. Jerome R. Fruend, and orthopedic specialist Dr. George D. Henning. The ALJ also addresses the physical capacity assessments performed by

state agency physician, Michael J. Hartman, and affirmed by Dr. Richard M. Surrusco in 2001, and another performed by Dr. Surrucso in 2004 and affirmed by Dr. William R. Mauck in 2005. The ALJ also discusses the consultative examination performed by Dr. William Humphries in April, 2006 following the administrative hearing. The ALJ considers the two evaluations of Hall's claimed mental impairments done by state agency psychologists Hugh Tenison and Joseph Leizer.

After canvassing Hall's treatment history, the ALJ observed that her treating physicians "have prescribed as a fundamental part of her treatment an increase in exercise, including walking and aerobic exercise as treatment for her subjective complaints." (R. 26) The ALJ concluded from this that "[t]hese prescriptions of an increase in exercise and for physical therapy are a testament that her treating doctors do not believe that she is dysfunctional as a consequence of her impairments and allegations of pain. Moreover, although she has chosen to circumscribe her activities of daily living from what they had been in the past, relying on her complaints of pain and fatigue as justification, even those activities of daily living, circumscribed by choice, do not demonstrate the extreme level of chronic daily dysfunction consistent with pain as she describes." (R. 26-27)

The ALJ discounted the physical capacity assessment of Dr. Strong, which indicated that Hall would miss more then four days a month, because that opinion conflicted with his treatment records. The ALJ noted that "[t]hese records include observations that the claimant engages in activities that are in contradiction with the degree of limitation expressed in the physician's opinion." (R. 27) In contrast, the ALJ accepted the opinions of the various state agency doctors who likewise evaluated Hall, noting that those opinions were well-supported by medically

7

acceptable clinical and laboratory diagnostic techniques and were not inconsistent with other substantial evidence in the record. (R. 27)

The first treatment note in the record from Dr. Strong was in April, 2003, when Hall complained of asthma compounded by her cigarette smoking, high blood pressure, rapid heart beat and anxiety and panic attacks. (R. 444) A month later, Dr. Strong and Hall discussed her back pain, which was being treated by orthopedist Dr. Henning. Hall told Dr. Strong that her back pain was doing better, and her physical examination showed minimal tenderness over her low back, negative straight leg raises and no neurological issues. The plan was to continue her back exercises. (R. 442) A January, 2004 note indicated that Dr. Henning had ordered an MRI which showed some bulging discs. (R. 441) On physical examination, Dr. Strong noted:

> [S]he has point tenderness over L4/L5, reflexes are 1+ and straight leg negative. Neurological intact. Diminished flexion and extension, rotation and twisting. She has pain over the right sacroiliac joint which showed some questionable insufficiency and questionable fracture over that area.

(R. 440) Eight months later, in August, 2004, Hall saw Dr. Strong for asthma, reflux, anxiety, insomnia, blood pressure and neck pain. Dr. Strong suspected degenerative disc disease and ordered a cervical x-ray, (R. 437-38), which showed significant arthritis of her cervical spine. (R. 432) The record noted that Hall had been seeing Dr. Winikur, a pain specialist, and had been receiving injections for her back pain "which is somewhat better." (R. 439) Three weeks later, on September 16, 2004, Hall complained of low back and neck pain and stated that she "had 12 injections that didn't really help." (R. 436) Dr. Strong referred her to physical therapy. Hall underwent physical therapy in September and October, 2004, and Dr. Strong saw her again on October 22, 2004. Dr. Strong's treatment note of that day indicates that Hall had been told by

8

her physical therapist that she might have fibromyalgia. Dr. Strong's patient history recounts that:

> [I]n view of her symptoms, she now admits to having a more diffused pain syndrome than what we had talked about before. She has known DDD [degenerative disc disease] of her back and is seeing Dr. Winikur in Martinsville. She is not getting epidural steroids any more. They only helped a little bit. Previous arthritis profile has been negative.

(R. 458) Dr. Strong's records reflect that fibromyalgia was added as a problem at this visit, the text of his note stating that "this certainly could represent a component of fibromyalgia." (R. 458) At the same time, however, the October 22, 2004 note makes no mention of fibromyalgia trigger points, the physical examination reflecting only "diffused muscle tenderness in arms, neck, shoulders, back, legs and feet." (R. 457) Dr. Strong did not change any of Hall's medications and ordered a continuation of physical therapy.

After this October, 2004 visit, Hall was not seen again by Dr. Strong for more than a year.

Hall was last seen by Dr. Strong on January 4, 2006. This visit did not address any physical problems except to note a problem with chronic constipation and abdominal pain and to note her history of being "on chronic pain medications thru Dr. Winikur for pain management for degenerative disc disease of the neck and back." (R. 507) Apparently, the focus of this visit was a concern about her husband being increasingly anxious and stressed and throwing temper tantrums, causing Dr. Strong to discuss counseling with family services. (R. 507)

Although Dr. Strong's notes reflect that he had not seen Hall for any physical problems since October, 2004, Dr. Strong completed a "Fibromyalgia Residual Functional Capacity Questionnaire" some sixteen months later, on February 26, 2006. In this questionnaire, Dr.

Case 6:07-cv-00021-NKM-mfu   Document 19   Filed 06/17/08   Page 9 of 14   Pageid#: 69

Strong concluded that Hall was "capable of low stress jobs," (R. 511), but that she could only sit and stand/walk a total of two hours in an eight hour day and needed to walk every fifteen minutes. (R. 512) The questionnaire indicated that Hall could never lift any amount of weight, could never twist, stoop, crouch, squat, or climb and that she had significant limitations with reaching, handling and fingering. (R. 513) Dr. Strong also indicated that Hall would miss more than four days a month. (R. 513)

Substantial evidence supports the ALJ's decision to discount the opinion reflected in Dr. Strong's questionnaire responses when contrasted with his treatment notes. Although Dr. Strong saw Hall between April, 2003 and early 2006, there is only one reference to fibromyalgia, and that comes as a new problem in October 2004. At the time of this diagnosis, there is no discussion of fibromyalgia trigger points or other clinical basis for the diagnosis.[2] Rather, from the text of the note, it appears to be a response to Hall's statement that her physical therapist told her that she might have fibromyalgia. In any event, Dr. Strong's reference to fibromyalgia is not definitive as he states she "could have fibromyalgia." (R. 457) There is nothing objective in Dr. Strong's medical records to confirm that the suggestion by her physical therapist was correct. Of significance, Dr. Strong did not answer the question on the "Fibromyalgia Residual Functional Capacity Questionnaire" asking him to "[i]dentify the clinical findings, laboratory and test results that show your patient's medical impairments," (R. 510), instead leaving the answer space blank. Given the disparity between the observations and treatment reflected in Dr. Strong's medical

---

[2] According to Medline Plus, a service of the U. S. National Library of Medicine and the National Institutes of Health, "[d]iagnosis of fibromyalgia requires a history of at least three months of widespread pain, and pain in at least 11 of 18 tender point sites." http://www.nlm.nih.gov/medlineplus/ency/article/000427.htm.

records and the extreme limitations reflected in the questionnaire responses, and the lack of objective clinical findings for the rather tentative conclusion that Hall "could" have fibromyalgia, (R. 457-58), the ALJ was justified in not according Dr. Strong's questionnaire controlling weight and determining that Hall's claimed fibromyalgia was not severe. The ALJ's consideration of Dr. Strong's opinion was fully explained in the ALJ's opinion and appears well supported in the record.

Further, the residual functional capacity ("RFC") found by the ALJ is well supported in the other medical evidence in the record. Dr. Henning of Roanoke Orthopaedic Center treated Hall for complaints of back pain during 2003. Dr. Henning treated Hall by prescribing some medications and exercises. An MRI taken in late 2003 showed bulging discs in several places and a small herniation which did not really compromise the nerve root. (R. 384) In this last examination, Dr. Henning described Hall as having "a little discomfort" in her low back and legs on straight leg raising and "mild tenderness" at the lumbosacral junction. (R. 384) Certainly, the symptoms and physical examination performed by Dr. Henning does not indicate a condition reflecting disability from all work.

The record reflects that Hall was treated by Dr. Larry J. Winikur and nurse practitioners at Piedmont Pain Management beginning in February, 2004 for her complaints of low back pain and later for cervical pain. Hall received multiple injections of pain medications and was prescribed a narcotic pain medication, Percocet, to manage her pain. These injections provided pain relief for periods ranging from a few days to a few weeks. (R. 470, 493) By March 15, 2005, Hall reported that "her back pain is not bad at all and she wishes to have treatment on her neck." (R. 476) During later visits, Hall again complained of low back pain. There are no

11

functional capacity evaluations or disability opinions from Dr. Winikur reflecting Hall's ability to work.

On April 13, 2006, Dr. William Humphries performed a medical examination on Hall for the Virginia Department of Rehabilitative Services. (R. 518-26) Hall's chief complaint at that time was mostly chronic low back pain. Hall told Dr. Humphries that she had suffered from low back pain for at least eight years, and it has increased to the point where it is there all of the time. (R. 518) While her back pain varied in intensity, it was exacerbated by standing for prolonged periods, lying down and in the morning. On physical examination, Dr. Humphries noted that her back range of motion was minimally reduced and there was moderate tenderness to palpation of the entire lumbar region. Dr. Humphries reported negative straight leg raising bilaterally to 90 degrees. (R. 519-20) Dr. Humphries also noted a slight reduction in the range of shoulder motion and a slight reduction in left hip range of motion due to low back pain. (R. 520) No significant neurological concerns were noted. (R. 520) Based on his examination, Dr. Humphries diagnosed Hall with hypertension; chronic lumbar strain; multiple arthralgias (could not rule out mild degenerative joint disease in the shoulders, wrists, hands and feet); multiple myalgias (could not rule out mild fibromyalgia); asthma; and possible mild degenerative joint disease of the cervical spine. (R. 521) In a medical source statement of ability to do work-related physical activities, Dr. Humphries concluded that Hall could lift 50 pounds occasionally, 25 pounds frequently, could stand and/or walk 6 hours in an 8 hour workday and could sit 6 hours in an 8 hour workday. Dr. Humphries found that Hall was limited to only occasional climbing, balancing, kneeling and crawling and had no manipulative limitation (reaching, handling, fingering or feeling). (R. 522-24) While somewhat less restrictive than the state

agency physical residual functional capacity assessments, Dr. Humphries' evaluation was generally consistent with the earlier findings by the state agency physicians who reviewed Hall's records in 2001 and 2004. (R. 330-37, 461-67)

Given Hall's treatment records, the state agency physician assessments and the examination by Dr. Humphries, there is substantial evidence to support the ALJ's decision not to fully credit Dr. Strong's extremely limited residual functional capacity and to find that Hall's claimed fibromyalgia was not severe. As a consequence, this case must be affirmed.

Considering the evidence in the administrative record as a whole, the court finds that the Commissioner's decision meets the substantial evidence standard. Again, it is not the province of the court to make disability determinations or to re-weigh the evidence in this case; rather, the court's role is to determine whether the Commissioner's decision is supported by substantial evidence. Considering that the Supreme Court has defined substantial evidence not to be a large or considerable amount of evidence, more than a mere scintilla and somewhat less than a preponderance, Pierce v. Underwood, 487 U.S. at 565, Richardson v. Perales, 402 U.S. at 401, it is clear that the Commissioner properly considered Hall's complaints of back, neck and joint pain and carefully examined the records of her treating, examining and consulting physicians and the other record evidence.

In affirming the final decision of the Commissioner, the court does not suggest that Hall is totally free of all pain and subjective discomfort. The objective medical record simply fails to document the existence of any condition which would reasonably be expected to result in total disability from all forms of substantial gainful employment. It appears that the ALJ properly considered all of the objective and subjective evidence in adjudicating Hall's claim for benefits.

13

Case 6:07-cv-00021-NKM-mfu   Document 19   Filed 06/17/08   Page 13 of 14   Pageid#: 73

It follows that all facets of the Commissioner's decision in this case are supported by substantial evidence. Accordingly, the undersigned recommends that the Commissioner's decision be affirmed and the defendant's motion for summary judgment be granted.

The Clerk is directed to transmit the record in this case to Norman K. Moon, United States District Judge. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within ten (10) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by the undersigned may be construed by any reviewing court as a waiver of such objection.

**ENTER**: This 16th day of June, 2008.

Hon. Michael F. Urbanski
United States Magistrate Judge